1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11  DIANE DUNCAN,
                                    NO. CIV. S-04-523 LKK/PAN
12
            Plaintiff,
13
        v.                                  O R D E R
14
    STATE OF CALIFORNIA, et al.,
15
            Defendants.
16  _____/

17

18      Plaintiff, Diane Duncan, brought suit pursuant to 42 U.S.C.

19  § 1983 against Sacramento County, the Sacramento County Sheriff's

20  Department, and Sheriff Lou Blanas ("defendants").[1]  Plaintiff's

21  allegations stem from her detention by defendants following her

22  participation in a June 2003 demonstration in Sacramento,

23  California.  Plaintiff's amended complaint alleges six causes of

24  action, including state and federal claims.  She seeks damages and

25  _____

26      [1]   Other defendants were either dismissed by stipulation or
    by court order.

                                    1

1  injunctive relief.

2   Pending before the court are cross-motions for summary

3  judgment.  Plaintiff moves for summary adjudication only on her

4  § 1983 claims in which she alleges that defendants interfered with

5  her First Amendment rights to freedom of expression and assembly,

6  her Fourth Amendment right to be free from wrongful detention, and

7  her Fourteenth Amendment right to equal protection of the laws.

8  Defendants move for summary judgment on all of plaintiff's claims.[2]

9  **I.**

10 **FACTS**[3]

11 **A.   PLAINTIFF'S ARREST & RELEASE FROM CUSTODY**

12  On June 22, 2003, at around 4:00 p.m., plaintiff was arrested

13 in downtown Sacramento while photographing and participating in a

14 demonstration concerning the United States Department of

15 Agriculture's International Ministerial Conference and Expo on

16 Agricultural Science and Technology.  Pl.'s SUF 1.[4]   Plaintiff

17 _____

18  [2] Although defendants have moved for summary judgment on all
causes of action, they have not specifically directed attention to

19 the request for injunctive relief.  As will become clear during the
course of this opinion, however, the crux of the suit is a

20 transportation plan developed by defendants in response to a
specific demonstration that has come and gone.  Accordingly, there

21 appears to be no threat of repetition, and thus it seems clear
that the request for injunctive relief is moot.

22  [3] Facts are undisputed unless otherwise noted.

23  [4] The arrest report lists the charge as "parade violation."
Although the arrest report lists plaintiff's real address, her name

24 is listed as "Jane Doe."  In the "synopsis" section of the report,
there is a boiler plate description with blank spaces that are not

25 filled it.  It reads as follows: "On  at approx. _____
I observed _____ in possession of/wearing a _____ during a

26 parade defined by the Sacramento City Code.  Possession of/wearing

1  alleges that prior to her arrest she planned to return the next day
2  to continue observing and participating in the demonstrations.
3  Pl.'s SUF 2.

4     Upon arrest, plaintiff was transported to Sacramento County's
5  Rio Cosumnes Correctional Center ("RCCC") and was housed in the
6  Sandra Larson Detention Facility.  Pl.'s SUF 3 & 4.   When she
7  arrived at RCCC, plaintiff initially refused to give her name.
8  Def.'s SUF 35.  At around 2:00 a.m., however, plaintiff gave
9  officers her full name.  Def.'s SUF 37 & 40.  At around 5:10 a.m.,
10 defendants brought plaintiff and four male prisoners who had also
11 been arrested at the protest to a transport van waiting outside of
12 the RCCC.  Def.'s SUF 41.

13    What happened next appears to be disputed.  According to
14 plaintiff, when released from RCCC she was compelled to board the
15 van with the four other arrestees.  Pl.'s SUF 7.  It is undisputed
16 that after she boarded the van, plaintiff was driven to a release
17 site (a gas station) and she and the others were dropped off there.
18 Pl.'s SUF 8. Plaintiff was later picked up by a legal
19 representative and driven to her car, which was parked in downtown
20 Sacramento.  She then drove home.  Duncan Dep. at 61:8-18.  She
21 avers that she was exhausted, upset and scared of going through
22 what she "just went through" again.  Because of the experience,
23 plaintiff avers that she did not return to the protest the
24 following day.  Id.

25 ───────────────────
26 this object during a parade is prohibited by Sacramento City Code
   12.048.090."

3

1    Plaintiff cites to the depositions of two RCCC watch

2  commanders.  Lt. Milo Fitch testified that RCCC is a remote

3  facility and that normally the jail either requires that prisoners

4  being released arrange a ride for themselves,[5] provides money for

5  a taxi, or the prisoners are transported to the main jail and

6  released from there.  See Dep. of Milo Fitch ("Fitch Dep.") at 15,

7  Ex. D of Dec. of Jeffery Schwarzchild.

8    A special transportation plan had been developed for the June

9  Ministerial protest.  See §IB, Fitch Dep. at 19.  Plaintiff

10  maintains that all protesters released from RCCC were forced onto

11  buses and released at predetermined sites.  This assertion is

12  supported by deposition testimony of members of the Sheriff's

13  Department.  According to Captain Glenn Powell, under the

14  transportation plan, all protestors released from the RCCC were

15  boarded onto buses and dropped off at pre-designated release sites.

16  The protestors were not given the option of arranging for their own

17  rides.  Dep. of Glenn Powell("Powell Dep.") at 26, Ex. C of Dec.

18  of Jeffery Schwarzchild.  As Powell stated, "we opened the front

19  door and said everybody get on the bus.  It was like going to

20  school."  Id. at 30.

21    Defendants, however, maintain that plaintiff was not compelled

22  to board the van.  Defendants note plaintiff's deposition, where

23  she admits to not remembering if the defendants told her she was

24

25    [5]  People picking up releasees check in with the security
staff, explain who they are picking up and then wait in their car
26  until the inmate is released.  See Dep. of Milo Fitch ("Fitch
Dep.") at 15, Ex. D of Dec. of Jeffery Schwarzchild.

1  free to leave.  Similarly, plaintiff stated that she never asked

2  any correctional staff if she could arrange to have someone pick

3  her up.  Dep. of Diane Duncan ("Duncan Dep.") at 59, Ex. A of Dec.

4  of Jeffery Schwarzchild.  Finally, Captain Tracey Foster testified

5  that the special plan did allow for people being released to

6  arrange for their own transportation.  Foster Dep. at 37.[6]

7  **B.   THE "TRANSPORTATION OPERATION PLAN"**

8       Months before the protest, defendants created a

9  "transportation operation plan" which detailed how people arrested

10 at the Ministerial protests would be transported.  The Sacramento

11 Police Department had requested defendants' assistance as they

12 "anticipated several hundred arrests because of expected protest

13 tactics aimed at disrupting the conference."  Foster Dep. at 33.

14     Among other things, the plan provided for how those arrested

15 would be released from RCCC.  Under a section entitled "Post-

16 Booking Transportation," the plan reads: "The Transportation

17 Operation will arrange for the transportation of released arrestees

18 to one of several pre-designated drop-off locations (refer to

19 Release Sites, Attachment H.)."  Foster Dep. at A 343, Ex. A of

20 Dec. of Keith E. Nourot.[7]  Meanwhile, "attachment H" is an inter-

21

22      [6]  Defendants never submitted page 37 of the Foster
   Deposition, nor was the deposition ever lodged with the Clerk.
23 Thus, it would be proper for the court to disregard the defendants'
   reliance on the Foster testimony.  Nonetheless, plaintiff does not
   dispute that Foster did in fact make the statement.  Under the
24 circumstances, the court will treat the fact that Foster so
   testified as stipulated to.
25

26      [7]  Also attached to the Transportation Plan was a flow chart
   of what should happen to people arrested in the protest.  The flow

5

1  department correspondence entitled "proposed release areas."  This
2  memo listed five "drop-off" locations within the Sacramento area
3  and noted that each site had "ATM's, telephones, and restrooms
4  nearby."  Foster Dep. at A 359.   This memo was later revised by
5  Captain Foster who struck one of the sites because it was "a little
6  more dangerous than the others, a little rough area of town."
7  Foster Dep. at 44.   She also testified that she "wanted to make
8  sure that no one of these areas was impacted by a large group of
9  protestors."  Id. at 45.

**II.**

**STANDARDS**

12      Summary adjudication, or partial summary judgment "upon all
13  or any part of a claim," is appropriate where there is no genuine
14  issue of material fact as to that portion of the claim.   Lies v.
15  Farrell Lines, Inc., 641 F.2d 765, 769 (9th Cir. 1981) ("Rule 56
16  authorizes a summary adjudication that will often fall short of a
17  final determination, even of a single claim") (citations omitted);
18  Playboy Enters., Inc. v. Welles, Inc., 78 F. Supp. 2d 1066, 1073
19  (S.D. Cal. 1999), aff'd in part, rev'd in part, on other grounds,
20  279 F.3d 796 (9th Cir. 2002); E.D. Local Rule 56-260(f).

21      Summary judgment, meanwhile, is appropriate when it is
22  demonstrated that there exists no genuine issue as to any material
23  fact, and that the moving party is entitled to judgment as a matter

25  chart makes clear that after RCCC booking, people who were released
26  would be transported to "release sites."   Transportation Release
   Plan, at 1, Ex. K of Dec. of Jeffery Schwarzchild.

1   of law.  Fed. R. Civ. P. 56(c); See also Adickes v. S.H. Kress &

2   Co., 398 U.S. 144, 157 (1970); Sicor Limited v. Cetus Corp., 51

3   F.3d 848, 853 (9th Cir. 1995).

4       Under summary judgment and summary adjudication, the moving

5   party,

6           always bears the initial responsibility of informing the
            district court of the basis for its motion, and
7           identifying those portions of 'the pleadings,
            depositions, answers to interrogatories, and admissions
8           on file, together with the affidavits, if any,' which it
            believes demonstrate the absence of a genuine issue of
9           material fact.

10  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the

11  nonmoving party will bear the burden of proof at trial on a

12  dispositive issue, a summary judgment motion may properly be made

13  in reliance solely on the 'pleadings, depositions, answers to

14  interrogatories, and admissions on file." Id.  Indeed, summary

15  judgment should be entered, after adequate time for discovery and

16  upon motion, against a party who fails to make a showing sufficient

17  to establish the existence of an element essential to that party's

18  case, and on which that party will bear the burden of proof at

19  trial. See id. at 322. "[A] complete failure of proof concerning

20  an essential element of the nonmoving party's case necessarily

21  renders all other facts immaterial." Id.  In such a circumstance,

22  summary judgment should be granted, "so long as whatever is before

23  the district court demonstrates that the standard for entry of

24  summary judgment, as set forth in Rule 56(c), is satisfied." Id.

25  at 323.

26  ////

1   If the moving party meets its initial responsibility, the
2   burden then shifts to the opposing party to establish that a
3   genuine issue as to any material fact actually does exist.
4   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
5   586 (1986); See also First Nat'l Bank of Ariz. v. Cities Serv. Co.,
6   391 U.S. 253, 288-89 (1968); Secor Limited, 51 F.3d at 853.

7   In attempting to establish the existence of this factual
8   dispute, the opposing party may not rely upon the denials of its
9   pleadings, but is required to tender evidence of specific facts in
10  the form of affidavits, and/or admissible discovery material, in
11  support of its contention that the dispute exists.  See Fed. R.
12  Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; See also First
13  Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954
14  (9th Cir. 1998).  The opposing party must demonstrate that the fact
15  in contention is material, i.e., a fact that might affect the
16  outcome of the suit under the governing law, Anderson v. Liberty
17  Lobby, Inc., 477 U.S. 242, 248 (1986); Owens v. Local No. 169,
18  Assoc. of Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th
19  Cir. 1992) (quoting T.W. Elec. Serv., Inc. v. Pacific Elec.
20  Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the
21  dispute is genuine, i.e., the evidence is such that a reasonable
22  jury could return a verdict for the nonmoving party, Anderson, 477
23  U.S. 248-49; see also Cline v. Industrial Maintenance Engineering
24  & Contracting Co., 200 F.3d 1223, 1228 (9th Cir. 1999).

25  In the endeavor to establish the existence of a factual
26  dispute, the opposing party need not establish a material issue of

1   fact conclusively in its favor.  It is sufficient that "the claimed

2   factual dispute be shown to require a jury or judge to resolve the

3   parties' differing versions of the truth at trial."  First Nat'l

4   Bank, 391 U.S. at 290; See also T.W. Elec. Serv., 809 F.2d at 631.

5   Thus, the "purpose of summary judgment is to 'pierce the pleadings

6   and to assess the proof in order to see whether there is a genuine

7   need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R.

8   Civ. P. 56(e) advisory committee's note on 1963 amendments); see

9   also International Union of Bricklayers & Allied Craftsman Local

10  Union No. 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir.

11  1985).

12       In resolving the summary judgment motion, the court examines

13  the  pleadings,  depositions,  answers  to  interrogatories,  and

14  admissions on file, together with the affidavits, if any.  Rule

15  56(c); See also In re Citric Acid Litigation, 191 F.3d 1090, 1093

16  (9th Cir. 1999).  The evidence of the opposing party is to be

17  believed, see Anderson, 477 U.S. at 255, and all reasonable

18  inferences that may be drawn from the facts placed before the court

19  must be drawn in favor of the opposing party, see Matsushita, 475

20  U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654,

21  655 (1962)(per curiam)); See also Headwaters Forest Defense v.

22  County of Humboldt, 211 F.3d 1121, 1132 (9th Cir. 2000).

23  Nevertheless, inferences are not drawn out of the air, and it is

24  the opposing party's obligation to produce a factual predicate from

25  which the inference may be drawn.  See Richards v. Nielsen Freight

26  Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d

1   898, 902 (9th Cir. 1987).

2        Finally, to demonstrate a genuine issue, the opposing party

3   "must do more than simply show that there is some metaphysical

4   doubt as to the material facts. . . . Where the record taken as a

5   whole could not lead a rational trier of fact to find for the

6   nonmoving party, there is no 'genuine issue for trial.'"

7   <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

8                                **III.**

9                              **ANALYSIS**

10       Plaintiff moves for summary adjudication as to her § 1983

11  claims, while defendants move for summary judgment as to all of

12  plaintiff's claims.[8]

13  **A.   CLAIMS PURSUANT TO 42 U.S.C. § 1983**

14       Section 1983 requires a claimant to prove that defendant,

15  acting under color of state law, committed an act that deprived her

16  of some right, privilege, or immunity protected by the Constitution

17  or federal law.  <u>Leer v. Murphy</u>, 844 F.2d 628, 632-33 (9th Cir.

18  1988).  Counties and their law enforcement departments are

19  "persons" within the meaning of the statute.  <u>Monell v. Dep't of</u>

20  <u>Social Services of City of New York</u>, 436 U.S. 658, 690 (1978); <u>Shaw</u>

21  <u>v. State of Cal. Dep't of Alcoholic Beverage Control</u>, 788 F.2d 600,

22  ////

23

24       [8]  The court notes that plaintiff's briefs fail to address any
     of the state law claims.  The court takes plaintiff's silence as
25   a sign of non-opposition to defendants' motion.  Accordingly, the
     court grants defendants' motion for summary judgment as to the
26   state law claims.

604 (9th Cir. 1986).[9]  In this regard, it is established in this Circuit that California county sheriffs act as county officials when they establish policies concerning the release of persons from county jails.  <u>Thompson v. City of Los Angeles</u>, 885 F.2d 1439, 1444 (9th Cir. 1989); <u>Streit v. County of Los Angeles</u>, 236 F.3d 552 (9th Cir. 2001); <u>Brewster v. County of Shasta</u>, 275 F.3d 803 (9th Cir. 2001).

Municipal entities are subject to liability where "action pursuant to official municipal policy of some nature cause[s] a constitutional tort."  <u>Monell</u>, 436 U.S. at 691.  A direct causal link between departmental policy or custom and the alleged deprivation is required.  <u>See</u> <u>City of Canton v. Harris</u>, 489 U.S. 378, 385 (1989).

As noted, plaintiff asserts that the transportation plan's provisions governing the release of protestors from RCCC, violated her rights under the First, Fourth and Fourteenth Amendments.

## 1.  First Amendment Claim

Plaintiff's first claim asserts that the defendants deprived her of rights guaranteed by the First Amendment to the Constitution of the United States.  Below, the court sets out the relevant jurisprudence and then determines first, that defendants' motion relative to plaintiff's facial challenge to the transportation plan must be granted, but that a factual dispute precludes the granting

---

[9]  The Sheriff's Department is a proper defendant in a § 1983 case.  <u>See</u> <u>Anthony v. County of Sacramento</u>, 898 F.Supp. 1435, 1451 (E.D. Cal. 1995).

1  of summary judgment to either side with respect to plaintiff's as-
2  applied challenge.

3              **a.   As Applied & Facial Challenge**

4       Plaintiff challenges the release provisions of the
5  transportation plan both as it was applied to her and on its face.
6  Below, I briefly address the nature of such claims.

7       A facial challenge to an ordinance can be brought against any
8  regulation which by its terms regulates or implicates expressive
9  or communicative conduct.  <u>Nunez v. City of San Diego</u>, 114 F.3d
10 935, 950 (9th Cir. 1997)(citing <u>Broadrick v. Oklahoma</u>, 413 U.S.
11 601, 612-13 (1973)).  A regulation is facially unconstitutional if
12 it is invalid in every application.  <u>N.A.A.C.P., Western Region v.</u>
13 <u>City of Richmond</u>, 743 F.2d 1346, 1352 (9th Cir. 1984).  Thus, by
14 its nature, a facial challenge requires consideration of
15 applications of the regulation to conduct of persons other than the
16 plaintiff.

17      On the other hand, "[a]n as-applied challenge does not
18 implicate the enforcement of the law against third parties.
19 Rather, a litigant may separately argue that discriminatory
20 enforcement of a speech restriction amounts to viewpoint
21 discrimination in violation of the First Amendment." <u>Foti v. City</u>
22 <u>of Menlo Park</u>, 146 F.3d 629, 635 (9th Cir. 1998).  "A successful
23 as-applied challenge does not render the law itself invalid but
24 only the particular application of the law." <u>Id</u>.  The focus of an
25 as applied claim is the effect of the regulation on the plaintiff's
26 exercise of protected rights.

1                **b.   The Plan's Effect on First Amendment Privileges**

2          Not every ordinance that burdens conduct implicates the First

3    Amendment.  <u>Nunez</u>, 114 F.3d at 950.  It is well-established that

4    regulations of conduct implicate the First Amendment only if they

5    (1) impose a disproportionate burden on those engaged in First

6    Amendment activities; or (2) constitute governmental regulation of

7    conduct with an expressive element.  <u>Arcara v. Cloud Books, Inc.</u>,

8    478 U.S. 697, 703-04 (1986).

9          Here, there is ample evidence that the transportation plan

10   constituted regulation of conduct with an expressive element,

11   namely public protest of the Ministerial meeting.  The plan

12   specifically provided that the released demonstrators were to be

13   dropped off at pre-designated locations throughout Sacramento

14   county remote from the demonstration.  <u>Id</u>. at 343.  As Captain

15   Foster testified, the rationale behind the release provisions was

16   to hinder released demonstrators' ability to return to the "scene

17   of the crime", i.e. the protest area in downtown Sacramento.

18   Foster Dep. at 35.  In sum, it is undisputed that the purpose of

19   disembarking released protestors at the "drop off" locations was

20   to create an impediment to their returning to the protest.  It

21   follows that the plan implicated conduct protected by the First

22   Amendment to the Constitution since public protest of government

23   conduct is a traditional form of speech protected by the

24   constitution.  <u>Bates v. City of Little Rock</u>, 361 U.S. 516, 522

25   (1960).

26   ////

                                    13

### c. **Facial Invalidity**

Despite the implication of First Amendment protected activity, it does not follow that the transportation plan is facially invalid.  As noted, facial invalidity requires that the regulation be invalid in all applications.  <u>N.A.A.C.P., Western Region</u>, 743 F.2d at 1352.  The question of facial invalidity thus reduces to whether there are any circumstances under which the transportation plan, despite its purpose, might be lawfully applied.  It appears to the court that, if in fact there was unlawful activity at the demonstration site, that a particular demonstrator has been arrested by virtue of that unlawful activity, and the defendants had a reasonable belief that the arrestee would return to the demonstration and engage in further unlawful activity, the transportation policy might well be a lawful exercise of the police power to maintain public order.  I thus cannot conclude that there are no circumstances in which the transportation policy could not be applied lawfully.  Accordingly, defendants' motion must be granted insofar as it challenges plaintiff's facial challenge to the transportation plan.

### d. **As Applied**

The theoretical circumstances noted above have no application to the plaintiff's circumstances.  Given the mass arrests, the failure to complete the arrest report so that there was no evidence of unlawful activity, and the lack of prosecution of the plaintiff, there is simply no evidence that she was engaged in criminal behavior.  Accordingly, the court must conclude that

14

1  as applied to plaintiff, the release provisions of the

2  transportation plan were "directed narrowly and specifically at

3  expression or conduct commonly associated with expression."

4  Roulette v. City of Seattle, 97 F.3d 300, 305 (9th Cir. 1996).

5      Having established that the transportation plan implicated

6  plaintiff's First Amendment privileges, the court next applies the

7  traditional three-part test to determine if the policy is a

8  reasonable time, place and manner restriction.  Under the

9  traditional test, the policy must be (1) content neutral; (2)

10 narrowly tailored to a significant government interest; and (3)

11 leaves open ample alternative channels for legitimate expression.

12 Ward, 491 U.S. at 791.  If the policy fails any one of these

13 requirements, it is deemed invalid.   Gerritsen v. City of Los

14 Angeles, 994 F.2d 570, 577 (9th Cir. 1993).

15                        **i. Content Neutral**

16      "The principal inquiry in determining content neutrality, in

17 speech cases generally and in time, place, or manner cases in

18 particular, is whether the government has adopted a regulation of

19 speech because of disagreement with the message it conveys." Ward,

20 491 U.S. at 791.

21      Neither party has tendered any evidence to suggest that the

22 application of the transportation plan turned on the content of

23 plaintiff's speech. Rather, it appears to have been applied to all

24 the arrested demonstrators.

25 ////

26 ////

1          **ii.   <u>Narrowly Tailored to a Significant</u>**
                 **<u>Governmental Interest</u>**

2

3          The court next addresses the question of whether the

4   transportation plan was narrowly tailored to serve a significant

5   governmental interest.  For the reasons set forth below, the court

6   finds that defendants fail to demonstrate that the release

7   provisions of the transportation plan are narrowly tailored to a

8   significant governmental interest.

9          Defendants assert that they had a significant governmental

10  interest in promoting safety and in responding and processing

11  "those protestors who, rather than engage in legitimate protected

12  activity, broke the law and contributed to lawlessness and

13  potential riots."  Def.'s Opp'n to Pl.'s Mot. for Summ. J. at

14  13:11-14.  In her deposition, Captain Foster stated that the

15  defendants were planning for the worst.  There was a concern that

16  the protests would be like those in Seattle with "thousands and

17  thousands of people rioting in the streets." Foster Dep. at 34.

18  Foster did not want to release the demonstrators in a "location

19  where there could be violence and rioting."  <u>Id</u>. at 34:18-02.

20  Foster stated that "it did not seem prudent to us to take them

21  right back to where they had committed those crimes to facilitate

22  them re-offending."  <u>Id</u>. at 35.

23         Without doubt, these may be significant governmental

24  interests.  The inquiry, however, demands more.  Defendants must

25  also establish that the "the regulation promotes a substantial

26  governmental interest that would be achieved less effectively

                                  16

1  absent the regulation." <u>Ward</u>, 491 U.S. at 782-783 (1989).  In

2  other words, defendants must show that the unregulated activity in

3  question (here, allowing protestors to leave the RCCC under normal

4  release policies) endangers the government interests.  <u>See</u> <u>Kuba v.</u>

5  <u>1-A Agricultural Association</u>, 387 F.3d 850, 859 (9th Cir. 2004).

6  As the <u>Kuba</u> court explained, defendants "have the burden of showing

7  that there is evidence supporting its proffered justification."

8  <u>Id</u>.[10]  In short, postulating significant governmental interests is

9  not enough.  Defendants must also show that the unregulated

10 activity endangers these interests.

11      There are two serious impediments to the making of such a

12 showing.  First, as noted, there simply is no evidence that

13 plaintiff engaged in unlawful activity.[11]  Second, nothing suggests

14 that releasing plaintiff under the normal RCCC release policies at

15 5:30 a.m. would jeopardize safety or increase the potential for

16 rioting.  Nothing suggests that dropping plaintiff off at remote

17 locations better serves the interests mentioned above as compared

18 to allowing plaintiff to arrange for her own ride or taking a taxi.

19 ////

20 _____

21      [10]  In <u>Kuba</u>, the court found that the party imposing the
   speech restriction in question failed to meet its burden of proving
22 that demonstrators "handing out leaflets and carrying signs on the
   parking lot . . . would cause the congestion and danger to safety
23 [that] the [party] alleges."  <u>Id</u>. at 859.  The court went on to
   state that there was "no record of harm or safety concerns caused
24 by such activity."  <u>Id</u>. at 860.

25      [11]  The mere fact of arrest, without more, is simply
   insufficient.  There is no evidence as to what plaintiff was doing
26 at the time of her arrest.  From all that appears, plaintiff may
   simply have been swept up in the mass arrests.

1   Moreover, even if defendants had provided sufficient support for

2   their asserted interest in maintaining safety and preventing riots,

3   the release provisions are not narrowly tailored.

4        It is well established that "[a] statute is narrowly tailored

5   if it targets and eliminates no more than the exact source of the

6   'evil' it seeks to remedy." Frisby v. Schultz, 487 U.S. 474, 485

7   (1988).  To be narrowly tailored, a statute "need not be the least

8   restrictive means of furthering [the government's] interests, but

9   the restriction may not burden substantially more speech than

10  necessary to further the interests." United States v. Baugh, 187

11  F.3d 1037, 1043 (9th Cir. 1999).  Moreover, the tailoring of the

12  restraint must correspond to the purposes it serves.  Menotti v.

13  City of Seattle, 409 F.3d 1113, 1131 (9th Cir. 2005).  The court

14  must consider "whether the 'fit' between ends and means is

15  reasonable." City of Cincinnati v. Discovery Network, Inc., 507

16  U.S. 410, 417 n. 13 (1993).

17       In the case at bar, dropping off plaintiff did nothing to

18  promote defendants' stated interests.  Again, the court stresses

19  that there is no evidence that plaintiff was not simply caught up

20  in the mass arrests.  Moreover, once plaintiff was dropped off at

21  the remote locations, she used quarters given to her by the RCCC

22  staff to call a friend or colleague for a ride back to downtown

23  Sacramento.

24       In determining if the release provisions were narrowly

25  tailored, the court also considers if there are "obvious

26  alternatives" that are "feasible and allow substantially more

1  speech."  <u>Kuba</u>, 387 F.3d at 862 (9th Cir. 2004)

2      Here, the obvious alternative was the normal RCCC release

3  provisions.  Instead of dropping plaintiff off at the remote

4  location, defendants could have allowed plaintiff to arrange for

5  her own ride or take a taxi to her car.  This alternative is

6  clearly feasible as it is the normal RCCC policy.  For this reason,

7  it is clear that, as applied to plaintiff, the transportation plan

8  was not narrowly tailored to a significant governmental interest.

9      Given that the court finds that defendants' plan is not

10  narrowly tailored, it is unnecessary to proceed any further.

11  <u>Gerritsen</u>, 994 F.2d at 577.  The court need not address the

12  question of whether defendants' release plan allows for alternative

13  channels of communication.

14      In summary, the court concludes that the transportation plan

15  as applied to plaintiff violates her right of free speech and

16  assembly if in fact it affected her exercise of her rights.  As I

17  now explain, factual issues preclude a determination of that

18  question pursuant to the instant motions.

19          **d.  <u>Causation in Fact</u>**

20      Of course for the transportation plan to be found to have

21  inhibited plaintiff's exercise of her constitutional rights, it

22  must have, in fact, done so.  Thus, as this Circuit has made clear,

23  "[m]unicipal liability is only appropriate where a plaintiff has

24  shown that a constitutional deprivation was directly caused by a

25  municipal policy." <u>Nadell v. Las Vegas Metropolitan Police Dept.</u>,

26  268 F.3d 924, 929 (9th Cir. 2001).  It is well established that "in

1  any case alleging municipal liability under § 1983 [there] is the

2  question [of] whether there is a direct causal link between a

3  municipal policy or custom and the alleged constitutional

4  deprivation." <u>City of Canton</u>, 489 U.S. at 385.

5      Not surprisingly, the parties dispute whether a constitutional

6  violation was directly caused by defendants' release policy.

7  Plaintiff maintains that the defendants' release policy dissuaded

8  her from returning to the protest site, and this constituted an

9  injury to her constitutional right of free speech.  Defendants, on

10  the other hand, argue that the release provisions did not affect

11  plaintiff's decision.  They maintain that the "actions of the

12  Highway Patrol and Police Department when they arrested her and

13  allegedly 'militarized' the streets are what deterred [plaintiff]

14  from returning to the USDA conference." Defs.' Opp'n. at 8:20-22.

15  For the reasons discussed herein, the resolution of plaintiff's

16  First Amendment claim hinges on this factual dispute.  If a fact-

17  finder determines that there was no constitutional injury, the

18  inquiry ends there.  If, however, a fact-finder concludes that

19  plaintiff did suffer a constitutional injury as a result of

20  defendants' actions, then, for the reasons explained above

21  plaintiff's First Amendment rights were violated.

22      **2. <u>Fourth Amendment Claim</u>**

23      Before addressing the merits of plaintiff's Fourth Amendment

24  claim, the court must again address the threshold factual dispute

25  as to whether plaintiff suffered a constitutional injury related

26  to the implementation of the transportation policy.

1       Plaintiff claims that when defendants forced her onto the bus,

2   defendants violated her right to be free from unreasonable seizure.

3   Specifically, plaintiff maintains that she was "commanded to board

4   a Sheriff department van . . . ." Pl.'s Mot. for Summ. J., Duncan

5   Dec. at 2.  As noted above, the testimony of both Lt. Milo Fitch

6   and Captain Glenn Powell support her contention.

7       The Fourth Amendment prohibits "unreasonable . . . seizures."

8   U.S. Const. Amend. IV.  Although the Fourth Amendment allows some

9   delay in the release of inmates from jails, these delays must be

10  reasonable.  County of Riverside v. McLaughlin,  500 U.S. 44, 55

11  (1991).  The Supreme Court offers guidance on how to analyze claims

12  of unreasonable delay:

13          Examples of unreasonable delay are delays for the
            purpose of gathering additional evidence to justify the
14          arrest, a delay motivated by ill will against the
            arrested individual, or delay for delay's sake. In
15          evaluating whether the delay in a particular case is
            unreasonable, however, courts must allow a substantial
16          degree of flexibility. Courts cannot ignore the often
            unavoidable delays in transporting arrested persons from
17          one facility to another, handling late-night bookings
            where no magistrate is readily available, obtaining the
18          presence of an arresting officer who may be busy
            processing other suspects or securing the premises of an
19          arrest, and other practical realities.

20  County of Riverside, 500 U.S. at 56-57.

21      The Ninth Circuit has resisted creating a per se rule for

22  evaluating the reasonableness of delay.   Hallstrom v. City of

23  Garden City, 991 F.2d 1473, 1480 (9th Cir. 1993).  That said, the

24  Circuit has expressed concern about the practice of detaining

25  demonstrators.  In dicta, the Circuit condemned delaying

26  protestors' release from jail and remarked that ". . . while the

                                21

1   arrests were designed to end the demonstrations then occurring, the

2   detentions were intended to prevent future demonstrations."

3   Collins v. Jordan, 110 F.3d 1363, 1375 (9th Cir. 1996).

4        Defendants maintain that plaintiff was not compelled to board

5   the van, and that people arrested at the protest were allowed to

6   arrange for their own rides.  Defendants' reliance on plaintiff's

7   deposition acknowledgment that she never asked any correctional

8   staff if she could arrange to have someone pick her up hardly

9   supports their contention that she was free do so.  Defendants,

10  however, also cite to Captain Foster's deposition in which she

11  states that the release provisions did allow for people being

12  released to arrange for their own transportation.  Foster Dep. at

13  37.[12]  In light of the weight of the contrary evidence, it is not

14  clear to the court that the testimony raises anything but a

15  hypothetical, rather than genuine dispute of fact.  See Anderson,

16  477 U.S. at 248-49; Cline, 200 F.3d. at 1228.  Nonetheless, the

17  court recognizes that weighing the evidence is, at least initially,

18  for the trier of fact.  Conceivably, a fact-finder might determine

19  that plaintiff was free to arrange her own transportation, and thus

20  she was not unreasonably detained and thus suffered no

21  constitutional injury.

22       Again, it is undisputed that defendants' transportation plan

23  was aimed at delaying released protestors returning to the protest

24  _____

25       [12]  The court noted above the difficulty in defendant's
    reliance on this testimony.  See n.6.  Nonetheless, for the reason
26  explained there, the court will treat the testimony as having been
    given.

1   site.  In that sense, the release provisions constituted "delay for

2   delay's sake."  County of Riverside, 500 U.S. at 56-57.  Similarly,

3   purposefully delaying the release of protestors does not constitute

4   "unavoidable delay" associated with the practical realities of

5   operating a busy jail.  Id.  For these reasons, if a fact-finder

6   concludes that plaintiff was unreasonably detained by being

7   required to board the bus and being dropped at a remote location,

8   she suffered a violation of her Fourth Amendment rights.[13]

9   **C.   DEFENDANT BLANAS' LIABILITY**

10  Plaintiff named Sheriff Lou Blanas as a defendant, both in his

11  individual and official capacity.  Defendants assert that Sheriff

12  Blanas is entitled to qualified immunity.[14]

13  The Circuit has made clear that in the context of a § 1983

14  claim:

15  Anyone who "causes" any citizen to be subjected to a
    constitutional deprivation is also liable. The requisite

16

17  [13]   The court need not address plaintiff's Fourteenth
18  Amendment claim.  If plaintiff is able to show that the release
    policy caused her to not return to the protest, then, for the
    reasons discussed earlier, it will follow that the policy violated
19  plaintiff's First Amendment rights.  In the context of the
    Fourteenth Amendment, there is the same threshold factual dispute,
20  namely, whether plaintiff can show that the defendants' policy
    dissuaded her from protesting.  If the dispute is resolved in favor
21  of defendant, it will follow that the policy violates the First
    Amendment and therefore it is not necessary to even reach the
22  question of whether the policy also violates the Fourteenth
    Amendment.
23
    [14]   Because suit in an official capacity is actually a suit
24  against the entity, qualified immunity does not lie.  Hallstrom v.
    City of Garden City, 991 F.2d 1473, 1482 (9th Cir. 1993).
25  Nonetheless, since the suit is already directed towards the entity,
    suit against the Sheriff in his official capacity is redundant, and
26  will be dismissed on that basis.

23

1     causal connection can be established not only by some
kind of direct personal participation in the

2     deprivation, but also by setting in motion a series of
acts by others which the actor knows or reasonably

3     should know would cause others to inflict the
constitutional injury.

4

5   <u>Johnson v. Duffy</u>, 588 F.2d 740, 743-44 (9th Cir. 1978).

6       In the case at bar, although there was an explicit written

7   policy promulgated by the Sheriff's Department, and although there

8   is no question that the sheriff is the final policymaker,

9   plaintiff tenders no evidence of the Sheriff's involvement in

10  establishing the policy or even that he knew the release plan

11  existed. <u>See</u>, <u>e.g.</u>, <u>Board of Commissioners v. Brown</u>, 520 U.S. 397,

12  (1997)(holding that the plaintiff must show a direct link between

13  the action or inaction of the sheriff and the constitutional

14  injury). To infer personal knowledge from the fact that the policy

15  was printed on Department letterhead, which is what plaintiff

16  maintains, is insufficient to establish that Blanas knew or

17  reasonably should have known of the specific release provisions.

18  For this reason, plaintiff fails to establish that Blanas is

19  liable.

20                            **IV.**

21                         **ORDER**

22       For the reasons discussed herein, the court ORDERS as follows:

23       1. Defendants' motion for summary judgment on plaintiff's

24  facial challenge to the transportation plan is granted;

25       2. Defendants' motion for summary judgment as to plaintiff's

26  state law claims is GRANTED.

1       3.  Defendants' motion for summary judgment as to defendant

2  Blanas' liability is GRANTED.

3       4.  Both motions for summary judgment as to the Section 1983

4  claims concerning the as applied First Amendment claim and the

5  Fourth Amendment claims are DENIED.

6      IT IS SO ORDERED.

7      DATED: June 19, 2006.

8                            LAWRENCE K. KARLTON
                                SENIOR JUDGE

9                          UNITED STATES DISTRICT COURT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26